On the Merits.
Taliaferro, J.
The plaintiff sues C. A. Weed, proprietor, and M. IP. Bigney, editor of a newspaper called “The New Orleans Times,” for one hundred thousand dollars as damages alleged to have beeii •caused him by a false and malicious publication that appeared in that paper on the seventh of August, 1869, under the heading of “ Charge •of Embezzlement.” The defendants are sued in soKdo. Weed having gone into bankruptcy, his assignee was made a party.
Weed avers that the publication complained of is contained in an affidavit in the records of the Second Justice’s Court of-New Orleans; that he knew neither party to the proceedings; that in the publication he made no averment of the truth of the same; that it was made without malice; that it is not libelous, and is within the legitimate province of journalism; that an article explanatory of the same was published in “The Sunday Times,” at the instance of the plaintiff, without charge; that the gratuitous publication was demanded and yielded in full satisfaction of any injury plaintiff imagined he had suffered by the previous publication, and condoned any offense, if any had been done him, and that his resort now to a claim for damages is in bad faith, seditious, and calls for condemnation from the court. Bigney avers that he is not interested as a proprietor of the New Orleans Times, and that as employe he can not be held liable in solido witli the proprietor of that paper; he denies the authorship of the article complained of, and says that he is not liable therefor; and for further answer he adopts the answer of Weed. The day following the alleged libelous publication a communication coming from the plaintiff’s counsel was published in the Times, in which the whole matter, according to their views, was properly explained to the public. There does not appear to have been any agreement betweén the parties that this publication was to be. in full reparation of whatever wrong may have been done to the plaintiff; notwithstanding the publication, the defendants’ liability still remained, the explanatory article going only in mitigation of damages. The •charge made by Hickey against the plaintiff was withdrawn. The case was several times tried by a jury. There was judgment for $5000. This amount was thought to be excessive. The third jury gave a verdict for the plaintiff for $1000, and from this verdict the defendants *216 appealed. Plaintiff answered the appeal, and prays that his damages-may be increased to the amount claimed in his petition.
This controversy arose from an affidavit made before a justice of the peace of New Orleans, on the fifteenth of August, 1869, by one Edward Hickey. The affidavit is in these words:
“ State of Louisiana — City of New Orleans. Edward Hickey being duly sworn declares that his residence has, during several years past, been in Texas, but that he is preparing for removal to Louisiana; that his letters have been, during one year past, more or less, by his instructions to his correspondents, addressed to him in the care of J. M. Cass, who resides in the city of New Orleans, and therein does business as a. grocer; that lately, that is to say, in or about the month of J uly, Anno-Domini 1869, said J. M. Cass, and one Albert Cass, his son, who was employed or occupied with his said father in his store, at 75 Poydras street of said city, did receive a packet or envelope with inclosures, addressed to affiant, and marked and superscribed as follows, to wit “Value $100. Mr. Edward Hickey, care J. M. Cass, New Orleans, La. ” that said packet was duly sealed with sealing wax, and stamped with three seals or impressions on said wax, which impressions were in the following words, to wit: “John Holland, manufr. of gold pens, Cincinnati,” and when delivered to said J. M. Cass and Albert Cass contained one hundred dollars in current money, together with a certain blank deed, or deed unsigned, purporting that E. Hickey and-Hickey, his wife, did by such presents convey to said John Holland, his heirs and assigns, certain tracts of land situated in Missouri, for and in consideration of said sum of one hundred dollars. Affiant affirms that such funds belong to and were transmitted, or designed to-be transmitted, to affiant by said Holland, in pursuance of a certain agreement of sale between affiant and him. He further declares that-J. M. Cass, aided, assisted and abetted therein by said Albert Cass, his son aforesaid, did, contrary to the statutes and in violation of the peace and dignity of the State, tear, m utilate and break open such packet, addressed as aforesaid to affiant, and did therefrom extract, take, appropriate, embezzle, steal and carry away said one hundred dollars in lawful money, and that the same have never been received by affiant, owing to such felonious embezzling and stealing thereof by said J. M. Cass and Albert Cass.
Signed, EDWARD HICKEY.”
“ Sworn and subscribed before me, the fifth day of August, 1869.
Signed, A. SHELLEY, Second Justice Peace.”
The declarations made in this affidavit were ushered forth to the-world in the columns of the New Orleans Times, on the seventh of August, 1869, in an editorial article couched in the following language:
*217 “ Charge of Embezzlement. — An affidavit was yesterday made before A. Shelley, Second Justice of the Peace, by Edward Hickey, in which it is related that during the last year his letters, in pursuance of his instructions to his correspondents, had been directed to the care of J. M. Cass, grocer, who does business at 75 Poydras street, and such affiant charges that said J. M. Cass, aided and abetted therein by Albert Cass, his son, “did, in or about the month of July, contrary to the statutes, and in violation of the peace and dignity of the State, tear, mutilate and break open a certain packet addressed as aforesaid to affiant, and did therefrom extract, take, appropriate, embezzle, steal and carry away the sum of one hundred dollars in lawful money therein contained, and that the same have never been received by affiant, owing to such felonious embezzling and stealing thereof by said accused.” It is further related that said envelope contained an unsigned deed of sale importing that for said sum of one hundred dollars said Edward Hickey and his wife conveyed by such presents certain lands situated in Missouri to John Holland, of Cincinnati, whose seal was upon the envelope. According to the return of Officer Hotcht, to whom the writs of arrest in this case were intrusted, it appears that J. M. Cass, one of the accused, had gone on his annual business tour West, and could not be apprehended. The other accused, Albert Cass, was brought into court and gave bonds in the sum of $500, with MeG-loin & Kleinpeter as sureties, for his appearance to answer the charge. We learn that Mr. Hickey was indebted to the house of J. M. Cass, from whom he had long purchased his supplies, for a bill of groceries amounting to $109, got in June last, and that this summary proceeding on the part of the accused was merely a process of collection. We learn, also, that in rfddition to the deed to be signed by Hickey and wife the envelope contained a letter from Mr. Holland advising of the remittance inclosed, and requesting immediate execution of the deed of conveyance likewise transmitted, so that the accused were- sufficiently advised, after having broken open the packet, that the money belonged to a stranger, who could not by any logic, however tortuous, be supposed willing or bound to pay Mr. Hickey’s bill. Thus to arrest and expropriate funds belonging to innocent third parties, in the course of their transit, should have a conspicuous heading in the category of crime. A fortiori, as the lawyers express it, if persons to whose care letters are addressed may with impunity break them open to satisfy either their avarice or curiosity, chaos has come again. We are told that the accused are exempt from penalties of a felonious breaking imposed under the statutory postal regulations of the United States, inasmuch as the packet was received by express and not through the post-office. The sureties upon the bond of Albert Cass, we are informed» *218 are tlie legal advisers of the father. The writ for the arrest of the latter will await in the hands of the constable his return, which will probably be hastened by that circumstance, as Mr. Cassis an old merchant of this city. T. B. Howard, Esq., appears for the prosecution.”
The manner in which the writer of this article expresses himself is well calculated to impress the reader with the belief that he had confidence in the truth of the grave charges which he details as being contained in the affidavit. There is no saving clause or expression in his narrative of the contents of the affidavit even intimating that those charges may not be established. On the contrary, the tone and spirit of the article seem to display an effort to induce the belief that they were true. The inference may fairly be made that the writer himself believed the declarations of the affiant, and the obvious manifestation •of .that belief was well calculated to exert a malign influence against the fair character of the plaintiff. The affidavit itself, as simply a judicial proceeding, or an event happening in the usual course of administrative justice, is not published in its own terms without note or comment. But its contents are detailed conspicuously in an editorial article which would naturally attract to it more attention. Not only are the contents of the affidavit paraded before the public view, but they are treated of .in language condemning in very forcible terms the •conduct charged against the plaintiff; terms which do not leave the reader in doubt as to the writer’s belief in the truth of the charges. Terms and expressions are used that indicate indignant-feelings in the mind of the writer in relation to what he assumed to be the grave •offenses of the plaintiff; offenses which he deemed entitled to “a conspicuous heading in the category of crime, and which, if allowed to pass with impunity,” he thought would show that “chaos is come again.”
The following letter from Hickey to J. M. Cass, in evidence, shows that he authorized the plaintiff to open the very letter that he afterward aimed to get up a criminal prosecution against him for opening:
“ Sweet Home, Brashear City P. O., June 18, 1869.
“ J. M. Cass, New Orleans :
“Dear Friend — Please say to Albert that he has neglected to pack up the yeast powders and mustard. If any letters are for me from Cincinnati, from John Holland, I wish you to see if any of them contain a small draft, and if so, advise me without delay. Send balance ■of letters on hand by mail to me, at Brashear City.
“ Ever your friend,
Signed, “E. HICKEY.”
Albert Cass, a son, and at the time a clerk of the plaintiff, testifies that Hickey gave him verbal instructions to open any valuable packa *219 ges that he might think contáined money or drafts. The plaintiff swears that when this package was received and opened, he inclosed the letter that was from Holland to Hickey; that he informed him that the money was placed to his credit and was subject to his order; that afterward, when Hickey came to the city, he told him all the circura.stanees connected with the matter, and that he made no objections to the money being credited on the account of $109 he owed the plaintiff, and promised to pay the balance.
The affidavit was false and malicious. The defendants, by publishing its contents in the manner and with the comments they did, in a widely circulating newspaper, gave the false charges against the plaintiff an extensive circulation and imparted to them an air of authenticity which they would not otherwise have had, and which we may well suppose had a strong tendency to injure the character of the plaintiff. It is no justification to the defendants that they believed the affidavit to be true. Their belief in the truth of the charges tended rather to increase the bad effect of them against the plaintiff. That they have condoned for the publication of the offensive article by publishing the letter of the plaintiff’s attorney, affords no escape from the responsibility in damages to the injured party. The reparation of the injury to the extent that the publication of exculpatory and explanatory matter may be supposed to have made reparation, may be considered, and go only in mitigation of damages. Thousands may have read the libelous matter that never saw its refutation. Neither does it avail to say that the defendants had no malice or ill feeling against the plaintiff. In all cases of this sort, where the charge is false, the law implies malice in the publisher, not malice in the sense of hatred, spite or revengeful feeling toward the party assailed, but as showing an evil disposition, the malm animus which induced him wantonly, recklessly or negligently, in disregard of the rights of others, to aid the slanderer in his work of defamation by giving to him the powerful influence of the public press — written or printed slander being justly considered more pernicious than that uttered by words only.
In an action of libel proof of damages from the publication is not necessary to recover. The actual pecuniary damages in such actions can rarely be proved, and is never the sole rule of assessment. 3 An. <39; 11 An. 206; see also case of Perrett v. The New Orleans Times, 25 An. 174, and various cases there cited. We think the decree of the lower court should remain unchanged.
Judgment affirmed.